```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                    WESTERN DISTRICT OF NEW YORK
```

Ashley Newbury,                )
                               )
          Plaintiff,           )
                               )
      v.                       )    Case No. 1:17-cv-754
                               )
City of Niagara Falls,         )
                               )
          Defendant.           )

## OPINION AND ORDER

Plaintiff Ashley Newbury brings this action against Defendant City of Niagara Falls claiming unlawful discrimination and retaliation on the basis of sex.  Newbury alleges that while employed by the Niagara Falls Police Department ("NFPD") she was subjected to discrimination and a hostile work environment during her police academy training, and was terminated in retaliation for registering a complaint about her treatment.  Defendant submits that Newbury was fired for poor performance, and that the ultimate decision-maker was unaware of her claims.  Pending before the Court is Defendant's motion for summary judgment.  For the reasons set forth below, the motion for summary judgment is granted.

## Factual Background

Newbury was hired by the NFPD as a police officer on February 1, 2016, subject to a one-year probationary period. The City of Niagara Falls required all newly-hired police

officers to successfully complete training at the Niagara County
Law Enforcement Academy ("Academy" or "NCLEA").  Newbury
attended the spring 2016 Academy, which was co-directed by then-
NFPD Detective John Faso and Niagara County Sheriff's Office
("NCSO") Lieutenant Aaron Schultz.  Students included recruits
from law enforcement agencies across the region.  The parties
dispute whether Newbury's Academy class had 13 or 14 recruits,
but there is no dispute that Newbury was the only female in the
class.

Training at the Academy included defensive tactics,
physical training, emergency vehicle operations, firearms
training, and first responder training.  Instruction involved
classroom sessions and practical, reality-based scenarios.
Training took place in a paramilitary structure, with recruits
referred to by number rather than name and officers addressed by
either their full name, "sir" or "ma'am."  Defendant submits
that the Academy resembled a military-style boot camp.  ECF No.
44-1 at 2-3.

On February 3, 2016, NCSO Investigator J. Andres reported
that Newbury was unable to perform the "break fall" portion of
her training and "appeared to be ignoring the advice and
instruction of the instructors, failing to complete the
technique even with one on one instruction."  He also noted that
the entire class was disciplined because of Newbury's

consistently poor form.  ECF No. 44-7.  On February 9, 2016, Andres reported that Newbury was unable to perform the "wrist twist" or "wrist throw" portion of her training, again despite one-on-one instruction.  His report stated that Newbury "did not appear to be paying attention to instruction" and that the class had once again been disciplined because of her poor performance. ECF No. 44-8.

On February 10, 2016, Detective Faso reported that Newbury was observed to be crying and, when asked about the problem, stated that she was "feeling overwhelmed" during instruction. Detective Faso and Lieutenant Schultz spoke with Newbury and reportedly reassured her that such feelings were not unusual and that things should improve after she became accustomed to the Academy routine.  ECF No. 44-9.

On February 17, 2016, Investigator Andres reported that Newbury performed "below expectations and standards in almost every respect" during boxing training.  According to the report, Newbury "did not execute any punches in the manner in which she was taught prior, and was unable to protect herself even from the weakest of punches.  Ms. Newbury appeared as if she would give up or run away from any actual fight in a real life situation."  ECF No. 44-10.

The following week, Detective Faso and Lieutenant Schultz informed Newbury by memo that her test average for the Use of

Force portion of her training was 79%, while the required minimum was 85%.  Their memo also stated that she would be given remedial training and the opportunity to take additional tests to bring up her average.  ECF No. 44-11.

On February 25, 2016, Investigator Andres issued another report, this time relating to Newbury's performance on the "front choke escape" exercise.  The report documented her inability to perform the maneuver, her alleged lack of focus and poor effort, and the resulting discipline of the entire class. Each time Inspector Andres wrote such a report, Newbury signed it in acknowledgement.  ECF No. 44-12.

Newbury continued to receive reports critical of her performance through the conclusion of training in late May 2016. Defendant submits that she was the subject of at least 15 memos or reports authored by at least seven different instructors. ECF No. 44-1 at 4-5.

A March 3, 2016 memo stated that Newbury had "proven time and again that she cannot perform most tasks independently without support from her instructors."  ECF No. 44-13.  On March 16, 2016, Investigator Andres wrote that "Ms. Newbury does not appear to be developing or improving in any discernable or measurable way."  ECF No. 44-14.  On March 29, 2016, another trainer opined that Newbury was "suffering from a sever[e] lack of effort and understanding."  ECF No. 44-16.  A report of that

4

same date stated that Newbury "has proven that she cannot apply the most basic techniques and tactics that have been taught to her," failed to follow instructions, and would be unable "to protect herself in a highly stressed environment." ECF No. 44-17 at 1-2. In early April, Newbury was provided six hours of remedial training on defensive tactics. ECF No. 44-19.

On April 13, 2016, according to a memo written by Detective Faso, recruit Class President Keith Kennedy approached him privately and explained that the class was afraid to attend firearms training with Newbury due to her lack of sound tactics and safety. Detective Faso and the lead firearms instructor decided to assign an instructor to shadow Newbury during firearms training. ECF No. 44-20.

In an undated memorandum, Deputy Lisa C. Oliveri reported that Newbury had failed the Professional Traffic Stop portion of training. According to Deputy Oliveri, Newbury was unable to perform each step of the training independently. Her failures included an inability to recognize and respond to the threat of a weapon. ECF No. 44-21. Defendant notes that Deputy Oliveri is female.

Newbury's mid-term report stated that she was "failing to grasp basic concepts" and was "prone to breaking down and crying during difficult times of instruction both in the classroom and during proficiency areas." ECF No. 44-18 at 2.

5

On May 17, 2016, Newbury participated in a series of simulated, real-life scenarios.  A report authored by Lieutenant Schultz described one scenario involving an emotionally disturbed person.  When the individual grabbed a gun, Newbury's partner attempted to subdue him.  Instead of assisting her fellow recruit, Newbury pulled her gun and fired three rounds, striking only her partner.  ECF No. 44-24 at 2.  In another scenario involving a citizen drawing a gun, Newbury "flinched and turned her back."  *Id.* at 1.  A memo from Lieutenant Schultz cited "the catastrophic consequences from Recruit Newbury's response to a man with a gun," and opined that "the decisions Recruit Newbury made were catastrophic to the ideals and fundamentals of police work."  *Id.* at 1-2.

In a memo to Superintendent DalPorto dated May 17, 2016, Detective Faso explained that although Newbury had been able to meet minimum standards after remedial training in many areas, he had concerns about her ability to function in real-world situations.  Detective Faso expressed his opinion,

> as a twenty-one year veteran of Law Enforcement and Co-Director of the NCLEA, that although with continued remediation, recruit Newbury was able to meet Academy standards, she is unable to retain the information and demonstrate continued proficiency in these areas for any length of time.  I further believe that at this point recruit Newbury would be a liability to herself, other Law Enforcement and[] the public if placed on duty.

ECF No. 44-23 at 2.

In a May 20, 2016 meeting with Newbury and Detective Faso, Superintendent DalPorto shared Detective Faso's concerns.  The memo memorializing the meeting noted that, according to Detective Faso, Newbury took no responsibility for her performance and instead blamed her classmates.  Superintendent DalPorto informed Newbury that a decision would be made in the near future, and that termination was a possibility.  ECF No. 44-25.  Her employment was terminated on or about May 26, 2016. ECF No. 44-1 at 4.

Newbury notes that she completed all training requirements of the Academy successfully, and that she was due to receive a passing final grade.  Her mid-term score was equal to or higher than nine other recruits, and her final exam score was equal to or higher than ten other recruits.  Her proficiency average was higher than one other recruit.  ECF No. 49-7.  She further claims that during the termination meeting, DalPorto called her a "piece of shit."  ECF No. 49-5 at 75.

Newbury's Verified Complaint focuses on her treatment at the Academy.  For example, she alleges that on or about February 3, 2016, co-recruit Sebastian Czajka harassed her during a punishment run, screaming at her from behind to go faster.  ECF No. 1 at 3.  Newbury later testified that Czajka yelled, "speed it up bitch, let's go."  The word "bitch" was used multiple

times during the run, and according to Newbury's testimony,
Czajka "continued to say things until I went into the women's
section of the locker rooms."  ECF No. 49-5 at 18.

On or about February 17, 2016, Deputy Bull allegedly called
Newbury aside, asked why she was present and told her that she
needed to quit.  ECF No. 1 at 3.  Newbury submits that Deputy
Bull did not tell any of the male recruits to quit even though
some had failed the physical fitness test.  Newbury also notes
that, to that point, she had outperformed one fellow recruit on
most written examinations.  Newbury testified that Bull was
"[c]onstantly telling me that, you know, I need to quit and I
was going to be hurt if I didn't."  ECF No. 49-5 at 21.

That same day, Officer Herbert told Newbury not to wear a
chest protector during boxing training, and became angry when
she defied him.  ECF No. 1 at 3.  Newbury believes that Deputy
Bull also became angry and, as part of the boxing exercise,
"aggressively started punching [her]."  ECF No. 49-5 at 25.
Superintendent DalPorto testified that he had never known an
instance in which an instructor told a female trainee they
should not wear a chest protector.  ECF No. 49-2 at 13.
Detective Faso subsequently informed the entire class that
Officer Herbert had been wrong to tell Newbury not to wear a
chest protector.  ECF No. 1 at 3.

After the recruits finished their boxing training, Newbury went to get her own water because, although recruits were instructed to bring each other water, nobody would get water for her.  Newbury testified that while she was "huffing" and "puffing" as a result of the exercise, Deputy Ganz was circling her and "sizing [her] up."  Deputy Ganz then reportedly asked her, "What's wrong, hormones?"  ECF No. 49-5 at 27.

The next day, Deputy Grapes instructed the class to perform wrist throws.  Plaintiff testified that Deputy Grapes told her she was not performing the throws correctly, ordered her to stop and watch others, and caused her fellow recruits to become angry at her.  The Verified Complaint also claims that Newbury was isolated during certain activities, including a fingerprinting exercise, which reportedly affected her ability to learn.  ECF No. 1 at 4.

On or about March 4, 2016, some of the recruits went out socially after being dismissed for the day.  Newbury did not join them but was included on a group text message that stated "good times," referring to those in attendance, together with a meme stating "f*** you" to those who did not attend.  *Id.* Newbury does not know if she was the only one who did not go out with the group, and testified that she has no opinion about whether the meme was discriminatory.  ECF No. 49-5 at 45.

At one point during training, co-recruit Czajka sent a group text stating that "some of you look like a bag of ass" while in uniform.  The text included a fist emoji, which Newbury believes was meant to identify her because of a story she had told the group during which she showed her fist.  ECF No. 49-5 at 54.  She further notes that she was given a men's uniform that did not fit her.  *Id.* at 50-51.  Newbury also received a group text with a YouTube video entitled "Whiskey, Weed, and Women."  ECF No. 1 at 4.  The text included a two-dimensional, black silhouette of a woman.  ECF No. 44-34.  Newbury asserts that the woman depicted on the image is naked.

Newbury further claims that she suffered verbal abuse from superiors while at the Academy.  For example, she alleges that Officer Herbert told her "she was the worst human being ever to live."  ECF No. 1 at 5.  The Verified Complaint alleges that Deputy Grapes told her that "she didn't do a f**ing thing to deserve to be there."  *Id.* at 3.  Another person allegedly told her she was a "disgrace for wasting a valuable position" within her department.  *Id.* at 5.  When Newbury's mascara began to run down her face during a run, Officer Pappas told her that she looked "like an idiot" and to not "wear that again, you're not here to impress anybody."  ECF No. 49-5 at 32

Newbury testified about a series of other events involving Officer Pappas.  On one occasion, Pappas allegedly made a

10

comment about a logo on the bottom of her pants when she was
bending over.  ECF No. 49-5 at 33-34.  On another, he allegedly
asked her to place her arms around him while instructing her,
yet the exercise did not require her to do so.  *Id.* at 34-35.
Finally, Newbury claims that Pappas looked at her buttocks while
the students were performing "bear crawls."  *Id.* at 35-36.

The Verified Complaint also cites specific events involving
Deputy Grapes, including the wrist throw incident discussed
above.  During firearms training, Grapes allegedly brought a
knife close to Newbury's face and threatened to cut her finger
off.  The threat was in the context of Grapes noticing Newbury's
finger on the trigger guard instead of the outside of the
trigger.  ECF No. 1 at 6.  In another incident, Grapes grabbed
Newbury's arm and tossed her overhead, but did not do the same
to any of her male classmates.  ECF No. 49-5 at 58-59.

Newbury claims that she was treated differently than her
male counterparts in other ways as well.  For example, she
alleges that her time for completing an obstacle course was
improperly increased by several seconds.  ECF No. 1 at 6.
Defendant submits that she was appropriately penalized for
hitting a cone.  ECF No. 44-27.  Newbury also contends that
although the Academy did not allow recruits to work at other
jobs, one of the male recruits continued to own a food truck
without being disciplined.  DalPorto explained in his deposition

11

that a recruit could own a business while enrolled at the
Academy but could not perform work at the business during the
training period.  He also testified that, to his knowledge,
Academy personnel had not looked into whether the recruit in
question was performing work related to his food truck.  ECF No.
49-2 at 16-18.

Newbury complained of discriminatory treatment to Class
President Kennedy.  She specifically complained about receiving
a text message containing a picture of a flashlight with a
vagina.  ECF No. 49-5 at 41.  Newbury had allegedly been told
that any complaint should follow the chain of command, and
believed that it was Kennedy's responsibility to pass her
complaint on to Academy personnel.  *Id.* at 42.  According to the
Academy Rules and Regulations, duties of the Class President
included serving as the official representative of the class.
Superintendent DalPorto testified that the Class President acted
as "the liaison between the recruits and the directors."  ECF
No. 49-2 at 6.  DalPorto also testified that if a recruit had an
issue, he or she would "traditionally" bring it to the attention
of the Class President before speaking with a co-director.  *Id.*
at 6.  Defendant notes that nothing in the Academy rules
prevented a recruit from speaking directly with an
administrator, particularly with respect to such issues as sex
discrimination or a hostile work environment.

Academy policy was distinct from the employment policies and procedures of the City of Niagara Falls.  The City had a complaint process as part of its discrimination and harassment policy, encouraging employees to report any prohibited conduct to a department head, the City Administrator, the Director of Personnel, the EEO Officer for Complaint and Workplace Diversity, or to the committee assigned to manage claims of discrimination or harassment.  ECF No. 44-4 at 4.  Newbury did not avail herself of the City's procedures.  ECF No. 49-5 at 81-82.

Kennedy testified that he did not consider himself in the Academy chain of command.  ECF No. 44-32 at 4.  He was reportedly assigned the duty of Class President after "he was the last person to walk in."  *Id.* at 2.  Kennedy described his primary duties as possessing keys to let everyone into the Academy building, and giving a speech at the conclusion of the group's training.  *Id.* at 3.

It is undisputed that Kennedy never reported Newbury's complaints to Detective Faso or, to Faso's knowledge, Lieutenant Schultz.  ECF Nos. 44-35 at 22, 49-9 at 7.  Consequently, Detective Faso was not aware of Newbury's complaints, or of behavior she considered to be discriminatory or harassing.  ECF Nos. 44-35 at 23, 49-9 at 7.  Superintendent DalPorto was similarly unaware of any such behavior, as Newbury made no

13

report to him or to any other employee of the City of Niagara Falls.  ECF Nos. 44-35 at 23, 49-9 at 7.  It was DalPorto who ultimately terminated Newbury's employment with the NFPD.

Defendant submits that in her deposition, Newbury testified that the only thing she ever heard Superintendent DalPorto say about women or gender, and that she considered discriminatory, was that "he wasn't going to let someone stupid like me get one of his boys hurt on the streets." ECF No. 49-5 at 76.  Newbury never heard Detective Faso say anything about gender or women that was discriminatory.  ECF Nos. 44-35 at 25, 49-9 at 8. Defendant further notes that between 2013 and 2018, while DalPorto served as NFPD Superintendent, seven women successfully completed the Academy and became full-time NFPD officers.  ECF No. 44-2 at 2.  At the conclusion of his tenure as Superintendent, the NFPD force had 18 women out of a total of 147 officers.  *Id.*

## Discussion

**I.   Summary Judgment Standard**

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury

could return a verdict for the nonmoving party." *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d. Cir. 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 159 (2d Cir. 2021) (citation omitted).

## II.  Discrimination

Newbury claims that the City discriminated against her based on her gender in violation of Title VII of the Civil Rights Act of 1965 ("Title VII") and the New York State Human Rights Law ("NYSHRL").  Both claims apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which a plaintiff must first make out a *prima facie* case of discrimination.  *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). To establish a *prima facie* case, a plaintiff must show that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 75

15

(internal quotation marks omitted).  The plaintiff's burden at this stage is "*de minimis*."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  Nonetheless, she must establish all four elements of the *prima facie* case before the Court may proceed.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996).

If a plaintiff makes the required initial showing, the burden of production shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action.  "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

If the defendant offers a legitimate, nondiscriminatory explanation for its action, the plaintiff bears the final burden of demonstrating that defendant's reason was in fact a pretext for unlawful discrimination.  *See McDonnell Douglas*, 411 U.S. at 804; *Weinstock*, 224 F.3d at 42.  The ultimate question is whether a discriminatory purpose "was 'a motivating factor' for an adverse employment decision."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quoting 42 U.S.C. § 2000e-2(m)); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir.

2019) ("An employee need only show that sex 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'") (quoting 42 U.S.C. § 2000e-2(m)).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent.  At the same time, ... the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to other areas of litigation."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted). Ultimately, "[t]rial courts should not treat discrimination differently from other ultimate questions of fact."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).

### A.   Plaintiff's *Prima Facie* Case

Defendant argues that Newbury has failed to meet her *prima facie* burden because there is no evidence that the sole decisionmaker, Superintendent DalPorto, demonstrated any discriminatory animus toward women.  Defendant also contends that Newbury failed to show that similarly situated males were not terminated.  Newbury submits that DalPorto's comments at the final meeting give rise to an inference of discrimination.

At this stage in the analysis, the Court is mindful of Newbury's minimal burden.  It is undisputed that she performed well enough at the Academy to graduate.  The record also indicates that Newbury outperformed at least one male recruit on both written examinations and physical tests.  She was nonetheless terminated immediately prior to graduation, with DalPorto informing her that he was not going to let someone as "stupid" as her "get one of his boys hurt on the streets."

There is no dispute that Newbury is a member of a protected class.  Given that she was due to graduate from the Academy, it is arguable that she was qualified.  She was also the subject of an adverse employment action in the form of job termination. With respect to any inference of discrimination, her allegations that DalPorto fired her to protect "his boys" on the streets, while at the same time allegedly calling her "stupid" and a "piece of shit," satisfy the minimal burden of showing *prima facie* discrimination.

**B.   The City's Legitimate, Non-Discriminatory Reason**

Because Newbury has set forth a *prima facie* claim of discrimination, the burden shifts to the Defendant to come forward with a legitimate, nondiscriminatory reason for its decision.  The Supreme Court has explained that "this burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*

18

*Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). The Second Circuit has also made clear that a defendant's burden of production at this stage is "minimal." *Mhany Mgmt. Inc. v. County of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016).

The record makes plain that Newbury's performance at the Academy, although technically sufficient to pass, was often deemed unacceptable by her trainers. Some of the most serious failures occurred during real-world exercises. For example, in a traffic stop exercise the trainer noted Newbury's inability to respond to the threat of a weapon. Another simulation involved a citizen drawing a weapon, at which point Newbury reportedly flinched and turned her back. In a third simulation, involving an emotionally disturbed person reaching for a weapon, Newbury fired several rounds and shot her own partner. During firearms training, her peers felt unsafe around her. Ultimately, Detective Faso issued his opinion that Newbury would be a "liability to herself, other Law Enforcement and the public if placed on duty."

Detective Faso relayed his concerns to Superintendent DalPorto. DalPorto's affidavit submits that Faso had been keeping him informed of the progress of NFPD recruits, and that he "also received and reviewed a substantial number of memoranda and reports written by the co-directors and instructors describing their serious concerns about Ms. Newbury's

19

performance at the Academy." ECF No. 44-1 at 3. Those reports
and memoranda included feedback from Detective Faso, Lieutenant
Schultz, Deputy Oliveri, and Deputy Grapes. *Id.* at 4-5. Such
feedback, as acknowledged in writing by Newbury, reflected
consistent failures in mastery of skills and techniques, and in
her ability to accept instruction and make corrections.

DalPorto's affidavit explains that while achieving minimum
passing grades is a requirement for graduation, "each recruit
must also demonstrate the ability to apply what they have
learned to stressful, real-life situations safely and
effectively." *Id.* at 3-4. DalPorto also notes that the co-
directors and instructors at the Academy did not raise similar
concerns about any other NFPD recruits attending the Academy at
that time. Finally, DalPorto states that when he made the
decision to terminate Newbury's employment, he was not aware of
behavior that Newbury considered either harassing or
discriminatory "whether from recruits, instructors, or anybody
else affiliated with the Academy or NFPD." *Id.* at 5.

While the written documentation of Newbury's shortcomings
alone would have provided DalPorto cause for concern, he also
had the benefit of advice from the Academy's co-director,
Detective Faso. Faso's input on Newbury's readiness for police
duties was unequivocal, as he opined that she would be a danger
to herself, other officers, and the general public. Given

Faso's advice, together with the undisputed documentation of Newbury's performance, the Court finds the Defendant has satisfied its burden of showing a legitimate, non-discriminatory reason for her termination.

### C.   Pretext

Once a defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, "the employee must be afforded an opportunity to prove the existence of factual issues demonstrating that the stated reasons were merely a pretext for discrimination." *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 324 (E.D.N.Y. 2014) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)).  The burden of establishing pretext is a higher burden than that required to establish the *prima facie* case, as a plaintiff's "initially vague allegation of discrimination" must be "increasingly sharpened and focused" at this stage.  *Meiri*, 759 F.2d at 995.  As noted above, the ultimate question is whether a discriminatory purpose "was 'a motivating factor' for an adverse employment decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quoting 42 U.S.C. § 2000e-2(m)); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) ("An employee need only show that sex 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'") (quoting 42 U.S.C. § 2000e-2(m)).

The Court finds that Newbury has failed to carry her burden of showing her termination was pretextual.  DalPorto was presented with clear and consistent documentation of Newbury's poor performance.  Her failures during real-world simulations included shooting her training partner.  Having received Detective Faso's final memorandum expressing deep concerns, DalPorto decided that in order to protect his officers, Newbury could not serve as an employee of the NFPD.

An inference of discriminatory intent may be derived from a variety of circumstances including: "'the employer's criticism of the plaintiff's performance in [sex-based] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'"  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  In this case, nothing in DalPorto's decision-making would cause a reasonable juror to infer that gender was a motivating factor.  It is undisputed that several women graduated from the Academy and became full-time members of the NFPD while DalPorto was Superintendent.  It is therefore reasonable to infer that DalPorto's decision was not motivated by a desire to prevent a woman from joining the department.  Moreover, it would be unreasonable to infer that

DalPorto's reference to "his boys" did not encompass all members
of the NFPD.  As to DalPorto allegedly calling Newbury a "piece
of shit," the Court's disapproval of such treatment of an
employee does not impact its ultimate conclusion that, even when
making all reasonable inferences in Newbury's favor, the comment
pertained to qualifications rather than gender.

With respect to Newbury's treatment as compared to that of
male recruits, there is nothing in the factual record to suggest
that others performed as poorly as Newbury in certain critical
respects.  While Newbury may have outperformed her peers in
fitness tests and/or on written examinations, Detective Faso
highlighted two significant shortcomings: Newbury's inability to
retain and apply her training proficiently, and her inability to
protect herself and others.  Without any evidence of comparable
shortcomings by recruits, Newbury cannot show that she was
treated differently than members of a non-protected class who
were similarly situated.

Newbury also highlights inappropriate behavior by both
trainers and peers that, she claims, gave rise to an inference
of discrimination.  To the extent that Newbury relies on
performance evaluations by the various trainers, she offers no
evidence that those evaluations were either unfair or
discriminatory.  Trainer comments encouraging her to quit and
insulting her worth as a person might provide greater support

23

for a discrimination claim if they had influenced the termination decision, yet there is no evidence that DalPorto or the City of Niagara Falls were aware of, allowed, or condoned such comments.  The same is true of allegedly discriminatory actions by fellow recruits, as DalPorto testified that he was never notified of Newbury's allegations.  Nor is there any suggestion that DalPorto should have known of such behavior.

Where, as here, "an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest ... evaluation of qualifications, no inference of discrimination can be drawn."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (cleaned up), *superseded on other grounds by* Fed. R. Civ. P. 37(e).  The Second Circuit has also counseled that "[t]he court's role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments."  *Id.* at 103; *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019).  According to Detective Faso, co-director of the Academy, Newbury would have been a liability if allowed to serve on active duty.  That opinion was supported by Newbury's performance evaluations, and in particular her conduct during reality-based simulations. Defendant thus had a clear, legitimate, non-discriminatory reason for terminating Newbury's employment, and based upon the

evidence presented at summary judgment, no reasonable juror
could conclude that her termination was motivated, even in part,
by a discriminatory pretext.

## III. Retaliation

Newbury also claims that she was terminated in retaliation
for complaining about her treatment at the Academy.  The burden-
shifting framework laid out in *McDonnell Douglas* governs
retaliation claims under both Title VII and the NYSHRL.  *Summa
v. Hofstra Univ*., 708 F.3d 115, 125 (2d Cir. 2013).  To
establish a *prima facie* case of retaliation, Newbury must show:
"(1) she engaged in protected activity; (2) the employer was
aware of that activity; (3) the employee suffered a materially
adverse action; and (4) there was a causal connection between
the protected activity and that adverse action."  *Kelly v.
Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d
10, 14 (2d Cir. 2013) (citation omitted).  "Once a *prima facie*
case of retaliation is established, the burden of production
shifts to the employer to demonstrate that a legitimate,
nondiscriminatory reason existed for its action."  *Raniola v.
Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).  If the employer
demonstrates a legitimate, non-discriminatory reason, then
"[t]he burden shifts ... back to the plaintiff to establish,
through either direct or circumstantial evidence, that the

employer's action was, in fact, motivated by discriminatory retaliation."  *Id.*

Newbury's claim is based upon her report to Class President Kennedy.  That report, however, never reached Superintendent DalPorto or any other employee of the City of Niagara Falls. While there is a dispute of fact as to Kennedy's place in the chain of command, resolving that dispute in Newbury's favor does not help her establish a claim.  Kennedy testified that he did not consider himself in the chain of command and did not communicate Newbury's complaint to superiors.

Newbury claims that because of the chain of command at the Academy, Kennedy was acting as an agent of the Academy, and that the City of Niagara Falls therefore had constructive knowledge of her complaints.  In the Second Circuit, a plaintiff need not show that the ultimate decision-maker knew about her protected activity, and may instead rely on the employer's "general corporate knowledge."  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *see also, e.g., Summa*, 708 F.3d at 125 (finding general corporate knowledge where "a number of Hofstra officials ... were aware of Summa's complaints ... [a]nd, at a minimum, the University's legal office knew about the instant litigation").  Here, however, the only person to whom Newbury made a formal complaint was a fellow recruit. While a reasonable juror might consider Kennedy an agent of the

Academy and attribute to it a general corporate knowledge, no such juror would deem Kennedy an agent of the City.  Moreover, the City had an anti-discrimination policy with avenues for claims and complaints, and Newbury did not avail herself of those procedures.  The Court therefore finds that Newbury has failed to establish a *prima facie* showing of her employer's awareness of protected activity.

Furthermore, Newbury cannot show that retaliation was a factor in her termination.  The City has presented a legitimate, non-retaliatory reason for Newbury's termination, and the undisputed facts fall far short of showing that, instead, her firing was the result of DalPorto's knowledge of protected activity.  The Court therefore finds that the City is entitled to summary judgment on Newbury's retaliation claim.

## IV.  Hostile Work Environment

To survive summary judgment on a hostile work environment claim, a plaintiff must proffer evidence that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "This standard has both objective and subjective components: the conduct complained of must be severe or

27

pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.*

"Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) ((internal quotation marks and citations omitted).  In addition, although "[i]solated incidents usually will not suffice to establish a hostile work environment, ... [the Second Circuit has] often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175-76 (2d Cir. 2012) (internal quotation marks and citations omitted).  During the period of time at issue in this case, hostile environment claims brought under the NYSHRL applied the same standard as those pursued under Title VII.  *See Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 329 (S.D.N.Y. 2020).

Newbury cites a number of incidents that were clearly related to her gender.  The most obvious included the remark about hormones, the flashlight incident, a classmate calling her "bitch," and the response to her wearing mascara.  She also

claims that an instructor looked at her inappropriately.
Newbury further alleges differential treatment, as with the
recruit who was not punished for working outside of the Academy
during training, and the allegedly inaccurate reporting of her
time on the obstacle course.  Both of those latter charges are
disputed, as there is no suggestion that Newbury herself tried
to work outside the Academy, or that the penalty imposed for
hitting a cone in the obstacle course was misapplied.

The relationship of other alleged incidents to gender are
unclear.  Newbury does not dispute the facts underlying her
performance evaluations.  While some conduct by supervisors may
have been harsh, as with the threat to cut off Newbury's finger
when she placed it on the trigger of her weapon, the connection
to gender in those instances is, on the current record,
speculative.  It is similarly unclear whether insults and
comments about whether Newbury should be at the Academy were a
part of the training environment or, as alleged, evidence of
workplace hostility on the basis of gender.

The Second Circuit has "cautioned against setting the bar
too high" for hostile work environment claims.  *Terry v.
Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).  Defendant argues
that much of Newbury's treatment was related to performance
rather than gender.  Defendant further contends that the gender-
related comments, such as a co-recruit calling her "bitch" and

29

telling her to run faster, were not sufficiently severe to give rise to liability.  Viewing Newbury's claims in the totality, however, and assessing her allegations in a light most favorable to her as the non-moving party, the allegations of mistreatment during her time at the Academy are sufficient to survive summary judgment.  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020) (courts assess objective hostility according to the "totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance").  While the events alleged present a close question about the true nature of Newbury's treatment, a reasonable jury could find that such treatment was sufficiently consistent and demeaning as to unreasonably interfere with her ability to perform.

Nonetheless, even assuming a hostile environment, Newbury must also show that the City of Niagara Falls is liable for her alleged treatment.  For an employer to be held liable under a hostile environment theory, a plaintiff must establish a "specific basis for imputing the conduct creating the hostile work environment to the employer."  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted).  In this portion of the analysis, it matters whether the harasser is

a supervisor "empowered to take tangible employment actions
against the victim," in which the case the employer will be
strictly liable, or merely a co-worker, which requires a showing
of employer negligence.  *Vance v. Ball State Univ.*, 570 U.S.
421, 424 (2013).  Tangible employment actions include "hiring,
firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a significant
change in benefits."  *Id.* at 431.  The negligence standard also
applies to non-employees.  *See Summa*, 708 F.3d at 124.

Newbury does not allege that City employees were aware of
her allegations of either discrimination or a hostile work
environment, as the only specifically-alleged complaint was made
to a co-recruit, Class President Kennedy.  As noted previously,
Kennedy did not communicate that complaint to Academy personnel
and, significantly, the complaint never reached Superintendent
DalPorto, the NFPD, or an employee of the City.

Newbury again contends that she was compelled to report to
Kennedy, that she believed that her complaint would work its way
up the chain of command, and that the City therefore bears
liability for her treatment.  This contention is undermined by a
series of undisputed facts.  First, Newbury was a City employee,
and the City had its own reporting policies and procedures.
Newbury did not avail herself of those procedures.  *See Murray
v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d

Cir. 1995) (employer may be held liable for co-worker or non-supervisory harassment if it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it").  Second, while recruits were encouraged to report issues to their Class President, nothing in the Academy rules barred Newbury from speaking directly with the co-directors, other administrators, or someone at the City.  Third, Newbury testified that she spoke with Detective Faso about issues at the Academy, yet nothing in the record suggests that she raised with him allegations of severe or pervasive conduct based upon her gender.  *See, e.g.*, ECF No. 44-29 at 26.

Furthermore, Newbury's claims pertain primarily to individuals who were either her Academy classmates, or to trainers and personnel who had no power over her employment. Statements by Superintendent DalPorto during a single meeting, each of which arguably related to performance rather than gender, are insufficient to support a claim of a hostile work environment.  Consequently, Newbury must show that the City's failure to respond to her work environment was negligent.  *See Vance*, 570 U.S. at 424; *Murray*, 57 F.3d at 249.  Given that no City employee, including Superintendent DalPorto, was notified of Newbury's claims, no reasonable jury could find the City either knew or should have known about her allegations, and was negligent for failing to take appropriate action in response.

*See Duch*, 588 F.3d at 762.  The City is therefore entitled to summary judgment on Newbury's hostile work environment claim.[1]

<u>**Conclusion**</u>

For the reasons set forth above, the City of Niagara Falls' motion for summary judgment (ECF No. 44) is granted.


DATED at Burlington, Vermont, this 13th day of November, 2023.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
U.S. District Court Judge

---

[1]  Defendant's final argument is that Newbury failed to file a notice of claim as required by state law.  Because the Court finds in the City's favor on all substantive claims, it need not resolve this issue.